Oyez, oyez, oyez. All persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw nigh and give their attention for the court is now sitting. God save the United States and this Honorable Court. All right, be seated please. All right, the first case we'll hear is Defeo v. IonQ and Mr. Calandra. We'll hear from you first. Good morning, Your Honors. Brian Calandra, Pomerantz LLP on behalf of the plaintiffs and may it please the court. As Your Honors have seen in our papers, the parties have briefed a plethora of issues in this securities fraud class but this panel need only reach one issue, the question of whether defendants IonQ and certain of its executives and certain executives of a special purpose acquisition company that ultimately merged with IonQ, that their misrepresentations caused my clients, the plaintiffs, losses. And we submit that the Scorpion short seller. And your client is a short seller, right? I'm sorry, Your Honor? Well, the Scorpion LLC is a short seller. That is correct and Scorpion Capital authored a short report based on an internal investigation with 25 interviews, seven of which were with former employees, 11 experts, and five customers of the company. And that report, accurate or not, could cause them to make a lot of money. It could cause, they were short, that's correct, but short sellers, just at the macro level, play a valuable role in the securities markets because they are incentivized to go out and see if companies that are not necessarily vetted, and in the case of special purpose acquisition companies, really hardly vetted at all, are being genuine with the marketplace. And in this case, they found quite readily and in ways that we were able to corroborate in our own investigation, that defendants here were not being genuine with the marketplace and were trying to sell the marketplace on technology that did not exist. And even though Scorpion stood to profit, the profits that Scorpion stood to make probably paled in comparison to the profits defendants stood to make to the tune of hundreds of millions of dollars if this successfully, if this SPAC merger successfully closed. And Your Honor, you can see in your sister circuits that other than the Ninth Circuit, and we can go into why I think the Ninth Circuit's decisions are distinguishable, these kinds of short reports are routinely credited, whereas here they're based on a special investigation that's not immediate, of information that's not immediately available to those inside the company, or to the marketplace in general, I'm sorry, based on information that could not be readily ascertained by the marketplace in general. They talk to former employees and they talk to experts. And this is the kind of short report we have here. So to basically... How many of those are a short report where the short reporter says, we cannot and do not provide any representations or warranties with respect to the accuracy of these materials. We cannot and do not provide any representations or warranties with respect to the information provided to us. Your Honor, every single short seller report, every single one, carries that disclaimer. Is that in the record? We have tested it in our papers, and if you'll see in Lee v. Tal, a Second Circuit case at 837 F3rd 20, which sustained, in a loss causation context, a Muddy Waters was the name of the short seller's short report. Wait, you said it was in your papers. The question was, is it in the record? We have not submitted an exhibit showing all of the short reports out there and all of the disclaimers that are attached to those short reports. So that's a no, it's not in the record? Your Honor, even... Well, yes, it is. We do not have such an exhibit in the record. But even defendants do not dispute that these kinds of disclaimers are present in every single short report in the market. And even the district court acknowledged... Does that make a difference? Don't we accept the words for what they mean? Your Honor, just because... We look to how other courts have treated... It's almost as if a short report is attempting to manipulate the market based on evidence or statements that they don't want to back up with any assertion, so they have all that disclaiming language. But the long and short of it is the person reading that understands that the short report person is going to make money if the market goes down. And, Your Honor, if... And I... Taking what you said, in this particular case, if that were true, if the short report was enough on its own and investors would disregard it because they know that Scorpion Capital is making money, why... They wouldn't disregard it. They may accept it and knock the market down. The point being is they could be saying anything. The market, the people who purchase, may not take those disclaimers, read the fine print in detail. But the long and short is that the short report clearly intends to tell the public that the statements made by Ionic is puffery or crazy or whatever you want to call it. Falsities. Material misrepresentation. Well, that's your obligation. You're right. But, Your Honor, now this is an important distinction to make. What you are getting at is a question of whether the report is credible based on the fact that it contains a disclaimer. Can I ask you just another question? Collateralists bothered me along the other lines. Did any of the plaintiffs sell their shares? My clients, certain class members sold shares after the Scorpion report came out. Yes. In the record, some of the plaintiffs sold? It's not in the record before this court, but it is in the record before the district court. But also, Your Honor... Tell me about that. You say somebody sold? When did they sell? They sold in the weeks after the Scorpion report. Is that what's alleged or shown? That is, Your Honor, in the context of a security... I couldn't find it. That's why I'm pressing you. I'd like to know whether the plaintiffs acted, in other words, actually sold shares when the market was down. In the context of a securities class action, the plaintiffs are not obligated... I didn't ask you that, did I? I asked you where is the record did the plaintiffs show that they've sold? In the district court, in our lead plaintiff motion, we show the purchases and sales of IonQ stock during and I believe shortly after the class period. Is there any evidence to support those? In order to be appointed lead plaintiff, you have to provide proof of... I didn't ask you that either, did I? I said, is there anything to support it? Well, my clients have trading records. Were they in the record? They weren't required to submit them at the time... I didn't ask whether they were required. I'm asking, were they in the record? You know, these questions aren't too hard. You're very defensive about them. We can take the next steps, but it's good for us to have an agreement, what's in the record and what's not. This is a summary judgment record and we will act on the record. Respectfully, your honor, this is a motion to dismiss record, but I take your point, Judge Neumeier, and to answer your question, no, the proof of my clients purchases and sales are not in the record before this court. So the district court, in both opinions, said that the complaint had not sufficiently alleged loss causation, which is a specific required element. Why don't you give us your best explanation as to why the court was wrong? Certainly, Judge Agee. Under Singer, which, Judge Agee, you were on the panel for, the plaintiff must allege the exposure of the defendant's misrepresentation or omission and the relevation of new facts suggesting the perpetration of a fraud and that such exposure resulted in a share price decline. And that's it. There is no requirement of the credibility of the disclosure. In fact, this court has held in Singer that a disclosure can take any form. That seems to say, I can, as a plaintiff, I can plead loss and that's the equivalent of pleading loss causation. Not exactly, not necessarily, your honor. For example, if you, some courts have found that because there are multiple disclosures going on in the marketplace, a specific disclosure is not, can't be separated and is not sufficient to show loss causation. But here, we have additional facts. We don't just plead that this came out and the price fell, which under Singer gets us most of the way there. We also plead, I'm sorry, Judge Agee. Yes, we have four articles that came out in response to the, came out in response to the Scorpion report saying the stock price had fallen. Three of the articles say after or following and the fourth says the Scorpion report is helping drive a 10% decline in the stock. And then most importantly, defendants came out and issued not one, but two releases to try to stop the decline of the stock. Now, Judge Niedermeier. So what's wrong, what's wrong with that? I mean, didn't that a pretty natural thing to do? It's a sign that investors were reacting to the Scorpion report. And that, once again, it almost seems like to me, you're back to saying, I can plead there was a loss and that's the equivalent of pleading that there's loss causation. I mean, it's a fine point, but the element that has to be alleged and then proved is loss causation. You are correct, Your Honor. And in Singer, as you'll recall, there were two disclosures. One was of a subpoena sent to the defendant company and the other was an analyst report saying this subpoena is probably looking for legal violations. Not definitely, not conclusively looking for legal violations, but probably looking for legal violations. And we have effectively something analogous to that, where we have a short report saying we have investigated this company and this company is making misrepresentations about its technology. And we have market watchers reacting and saying, look, this is because this short report came out and because of what was disclosed in the short report. If you look at the Insider article, which defendants and the district court mischaracterize as attacking the Scorpion report, it isn't attacking the Scorpion report. I've read that several times, and that doesn't seem to be too far off. If you look, Your Honor, especially towards the fourth paragraph of the article, where it talks about how what IonQ appears to be, what Scorpion appears to be accusing IonQ of is exaggerating. That is not a particularly helpful analysis. I'm sorry, Your Honor? I'm quoting from the report, not a particularly helpful analysis. That dealt with one specific aspect of the report, the question of whether asking a quantum computer to add one plus one and two plus three was helpful. But that is the only critical part of that report. The rest of the report, especially as to claiming you have technology you don't have, which the report cautioned was an issue amongst these startup companies in the quantum space, as well as... Which paragraphs in your complaint do you think best support loss causation? Your Honor, would you prefer I refer to the original complaint or the proposed second amended complaint? The operative complaint, second amended. Exactly. Those paragraphs are... And tell us where you are in the appendix. Yes, of course, Your Honor. They are beginning on page JA 1054 at paragraph 233 and running through page JA 1057 at paragraph 240. We describe the... Wait, 1-0 or 0-1? 1-0. I'm sorry, Your Honor. Where it starts, the truth emerges. That's correct. The truth emerges is our loss causation allegations. All right. And also, I will point, Your Honors, to pages JA 0704 and JA 0705. And specifically on page JA 0705, paragraphs 4 and 5 of what I was referring to as the quantum insider article. It states, companies must strike a fine balance between explaining the investment thesis and painting the potential of businesses without straying into hype and misinformation. That is exactly what we allege IMQ was doing and which we support with testimony from an insider who was there who confronted the CEO of the company about his misrepresentations and to identify as people who spoke to the Scorpion report. I do understand and grant, Your Honors... But they're all anonymous, are they not? We know the identities... Well, we don't know the identities and neither does the market. Yes, but the market can evaluate whether what these individuals are saying may check out. And certainly, when... Now, I don't want to get sidetracked, Your Honors, off the point of loss causation unless you would like me to leave it. We're over your time now. Do you want to cover that on rebuttal? I will cover that on rebuttal. Thank you very much, Your Honors. Good morning, Your Honors. May it please the Court. My name is Ryan Blair from Cooley LLP and I am here on behalf of the IMQ defendants. I'll note that IMQ's General Counsel, Stacey Giamalas, is here with us this morning. Permeating plaintiff's case is a global deficiency that is fatal to plaintiff's Exchange Act claims. Plaintiff's case rests entirely on unreliable and uncorroborated anonymous sources contained within a financially motivated short seller report that expressly disclaims its own accuracy. That is where I would like to first focus my argument, followed by a discussion of why plaintiff's sole confidential witness, CW1, also is unreliable under this And then I will lastly address why plaintiff's two alleged ... All of that sounds like we're at the summary judgment stage. This is at the pleading, the motion to dismiss stage. Why aren't the paragraphs that opposing counsel cite to us from the complaint sufficient at this stage? Sure, Your Honor. So with respect to loss causation, the Hunter case makes clear that plaintiffs must satisfy Rule 9b's, Particularity Requirement, for pleading loss causation with sufficient specificity to evaluate whether the necessary causal link exists. This court's decision in Miller v. Ascensio, which is 364 F3 233, further clarifies that it's a defendant's alleged misrepresentation, not just a negative company event like an earnings mess, that must be the substantial cause of the investor's loss. And here, due to the unreliability of the Scorpion report, which I will get into, and CW1, plaintiffs cannot establish that specificity that any undisclosed truth leaked out. Because the reports are unliable and the sources are anonymous so they can't meet the 9b burden. That's correct. That's correct, Your Honor. But what's the theory of loss in the complaint? I mean, if you have a short seller who puts out this market information with the idea that if the market goes down, they benefit. The normal situation is where a person purchases and loses a profit that they otherwise would have. But here, if their action becomes true, they make money instead of losing money. That's correct. And they say, he alleges, I don't know if the complaint does, he alleges they sold in this period, which means they made money. So what's their theory of loss? So with respect to Scorpion Capital, they didn't loss. They lined their pockets by issuing what, frankly, Your Honor, is a hit piece on the company. And part of the reason why they don't, why the Scorpion report doesn't establish loss causation is because while this case is on all fours with Nectar, B of I, and Berkeley Lights, which, by the way, involved another Scorpion report that had the same exact expressed disavowal of any accuracy whatsoever. And importantly, with the Scorpion reports, they even claim that they ignored and omitted positive information about the company that was provided by these anonymous sources, who as you know, we don't know. But the Scorpion... Is Nectar, is that the Ninth Circuit case? That is, that is the Ninth Circuit, of course. That's correct, Your Honor. But, but our case is even stronger than the Nectar cases and Berkeley Lights, because the Scorpion report just doesn't take shots at IonQ, but it bemoans the quantum computing industry as a whole. Put differently, even assuming the dubious assumption that investors reacted negatively on recount of the report's issuance, given its character. It's unclear whether they did so due to statements specifically relating to IonQ and its technology, or to statements questioning the viability of the quantum computing industry as a whole. I'll give you just two examples. At Joint Appendix 514 through 521, the report highlights certain scientists' opinions, emphasis on opinions, that quantum computing as a whole will never be commercialized. And at Joint Appendix 588 through 615, the report talks about the small number of qubits for all current quantum computers, and the lack of suitable error correction generally within the industry. Of course, these are the precise risks which, about which IonQ warned investors, that it may never achieve broad quantum advantage with its 32-qubit computer or any others, that at least 72 algorithmic qubits, which was the benchmark to determine how powerful a quantum computer was, was needed to actually challenge classical computers, and that significant advancements in error correction to make the machines more reliable were needed in order for them to make these steps. Thus, some of these disclosures in the report can only amount to the materialization of a known risk, which investors already knew, which can't establish loss causation. And secondly, with respect to the articles that my friend referenced during his argument, I want to be clear that none of them addressing the report gave the report any credence. The first three of the articles merely framed it as what Scorpion alleged, not what they analyzed and determined to be true or false. And the Quantum Insider article viewed the report strongly with skepticism and cast doubt on both its accuracy and import, precisely for the reason he stated, quantum computers aren't designed to add 1 plus 1 and 1 plus 2. And to put that in a report really shows what IonQ described the report quite full-throatedly as breathtaking in its ignorance of the quantum computing industry as a whole. But separate and apart from sort of analyst reaction to the Scorpion report was certain customers who were identified specifically in the report. And this is at JA 718 and 720. Two customers that were cited in the report publicly renounced it as inaccurate and not reflective of their relationship with IonQ. Next I want to talk just briefly about the press releases that my friend talked about in response to the Scorpion report, IonQ's reactions. Now it's probably unsurprising that plaintiffs never allege what IonQ actually said in those press releases. And so I want to put that in the record. The first release was on May 4th at JA 690 and it states, quote, yesterday a report was issued by Scorpion Capital containing important inaccuracies and mischaracterizations regarding IonQ business and progress to date. IonQ went on and this is at JA 692 to 693, quote, last week the group Scorpion Capital published a poorly researched report that is riddled with disinformation demonstrating a breathtaking ignorance of the quantum computing industry in general and IonQ technology in particular. Now in what world would either of these releases, quote, reveal to investors that the report's claims were likely true? That's what plaintiffs claim in their reply brief at page time. In all honesty that's nonsense and I asked the panel to look at the Joy case. This is 2021 Westlaw 6536670 at Star 9 where the plaintiffs alleged this this sort of exact argument and the court soundly rejected it because the the issuer in that case stated that the report contained numerous errors, unsubstantiated statements, and misleading conclusions and interpretations. That's all IonQ did here. Now plaintiffs make much of that we didn't go line by line addressing each of the claims that the report made. Frankly IonQ has more important things to do like develop its quantum computers which is exactly what it was doing but because the report went after the quantum computing industry as a whole it did believe it needed to make these statements to say that the quantum computing industry is developing, it is young, but it is ongoing. You want a real quick as to the Scorpion report and why it's unreliable. Plaintiffs in their papers have suggested that we're somehow trying to raise the standard. We certainly are not. We have never argued that the Scorpion report is unreliable simply because it was authored by a short seller. Instead at all times we've argued here that allegations drawn from short seller reports must be viewed with caution because short sellers have an obvious motive to exaggerate any potential shortcomings of the targets of their short positions, especially where the exclusive source of those allegations come from anonymous sources. And we've cited a number of cases in our papers, the Miao case, Joy, and Berkeley Lights as guidance here because the Fourth Circuit hasn't addressed this specific issue. Confidential witnesses that were asserted in a short seller report. And the Miao case provides an exhaustive discussion of the, as they say, it twinned concerns of anonymous sources cited in a financially motivated short seller report. And at Miao at 442 F sup 3d at 803 804 they list five potential indicia of unreliability under such circumstances and every single one of them is present here. So I'll go through the five very briefly. First, all of Scorpion's anonymous source allegations are unmoored in time. These discussions, there's no no representation as to when they occurred and in fact the Scorpion report's disclaimer freely acknowledges that the information provided by these sources, quote, may be outdated. Second, the former, the alleged former employee sources are described only as, quote, former IonQ executives or employees without regard to what their duties were, in which division they worked, or when, or whether they even worked on ARIA, which is the machine that plaintiffs claim don't exist. Now those details are the critical ones necessary for this court's determination under the Hunter case, which sets out the circuit standard for confidential witness allegations. And again, the same goes for the report's purported experts whose credentials aren't provided, which makes their Scorpion's purported experts adding 1 plus 1 or 1 plus 2 on IonQ's Harmony machine, which is an 11 qubit machine, all the more sort of nonsense, particularly when plaintiffs do not, because they cannot, offer any information about the soundness or quality of the technical analysis in the report. The third point, Your Honors, no independent, well-led factual allegations corroborate the Scorpion Report's claim that ARIA didn't exist. And in fact, the record plainly demonstrates, this is at Joint Appendix 457 through 491, that ARIA was in use during the class period. And peer-reviewed research articles, including known entities like Fidelity, Goldman Sachs, and a quantum computing industry-driven consortium called the QEDC, bear this out. Again, that's at Joint Appendix 457 through 491. Put simply, to give credence to plaintiff's theory that ARIA didn't exist, is to believe that each of these renowned third parties were somehow in on this fraud. That simply doesn't pass the smell test, Your Honor. The fourth point, plaintiff's counsel is not alleged to have done anything whatsoever to confirm the identities or statements of the anonymous sources cited in the Scorpion Report. And as the Miao case described, such allegations, where neither investigated nor corroborated, sit at best uneasily with the requirements of Rule 11. And the fourth point, finally, the Scorpion Report is riddled with clear, factual errors. Most notably, both Scorpion and plaintiffs conflate the distinct concepts of accuracy versus error rates in the quantum computing context, a distinction that is clearly described at Joint Appendix 416. Now, plaintiffs make no attempt to explain why this panel should credit the report's assertion that the two are the same. And again, as Miao noted, plaintiffs' failure to recognize and engage with the dubious reliability of the Scorpion Report is really concerning and necessarily raises doubt as to whether the other factual representations in the same report can be credited as a reliable basis to establish the factual My last minute, I'd just like to highlight something that was raised in the Macrogenics case. And the court in that case recognized that cutting-edge technology companies like IonQ constantly find themselves in the hot seat because they must walk the line between expressing enthusiasm for the incremental advances they make and setting realistic expectations for investors in a potentially transformative industry. Here, IonQ carefully walked that line and forthrightly disclosed to investors both the advancements and limitations of its quantum computers at all times. The District Court's decisions should be affirmed. Thank you, Your Honor, unless you have any questions. Thank you. Mr. Hines. Good morning, Your Honors. May it please the Court. Michael Hines on behalf of the DMY defendants. I plan on using my very limited time to discuss the lack of particularized facts giving rise to a strong inference of scienter or fraudulent intent. As in this circuit, to plead scienter, a plaintiff must allege particularized facts. If we find there's an inadequate pleading of loss causation, we don't need to address that, do we? You are 100% correct. When plaintiff's allegations are analyzed under the standards articulated time and again by this Court, we respectfully submit that the complaint does not allege any inference of scienter, let alone the cogent and compelling inference of fraudulent intent required by the PSLR Act. And plaintiff's scienter allegations generally fall into four categories. The first one is that DMY defendants conducted generalized due diligence, so therefore must have known of problems. Secondly, that all the defendants were motivated to sell stock in the future. Third, Mr. DeMasi, in particular, has a master's degree in physics. And lastly, the challenge statements discussed I&Q's so-called core business operations. And this Court has rejected each and every one of those individually or collectively time and again. Turning first to due diligence, plaintiffs allege that the DMY defendants conducted due diligence on I&Q over 16 weeks prior to the merger. And according to the plaintiffs, that due diligence was comprised of meetings and calls with I&Q's management team and also receiving access to a data room that had certain financial forecasts and a management presentation about I&Q's technology. But nowhere in the complaint are there any allegations at all about what the DMY defendants learned during those alleged meetings and calls with I&Q's management. There are also no allegations whatsoever about what was learned through the referenced I&Q management presentation concerning I&Q's technology. And those lack of allegations are fatal. And this Court rejected identical allegations in the Siona's health case, holding that the fact that mere general due diligence occurred does not the inference that defendants learned anything specific. That is also true here. Regarding motive, this Court has held many, many times that alleged motives that are common to every executive in corporate America, such as the desire to increase one's own compensation through stock sales, adds very little to an inference of fraud. And contrary to plaintiffs' arguments, that's also true in the context of a merger transaction. In the Phillips case, this Court addressed that very thing and held that allowing plaintiffs to allege motive based on a merger and realize gains on company stock would force every director of every company in corporate America to defend security fraud actions every time that a company affected a merger. Same is true here. And last but not least, also inadequate as a matter of law are plaintiffs' allegations about Mr. individual defendants must have known of problems because their statements addressed the so-called core operations of INQ. Those allegations are nothing more than impermissible allegations that executives acted with Scienter merely because of their status. And this Court in Yates rejected the same kind of allegation, holding that we require additional detailed allegations establishing a defendant's actual exposure to any problems or issues. No such allegations are present in this case. In short, all of plaintiffs' Scienter allegations are directly contrary to the standards set forth in Yates, Sciona's Health, Phillips, McGuire, Cozzarelli, and many of the other cases from this Court. We respectfully submit that the dismissal should be affirmed. Thank you very much. All right, thank you. Mr. Kalandra. Thank you, Your Honors. I do want to focus on what Mr. Blair said about defendants' response to the Scorpion Report. The Scorpion Report, remember, the chief disclosure that we have confirmed with CW1, who confronted defendant Chapman personally multiple times about the fact that he was not being honest about the existence of a 32-qubit computer. The chief disclosure in the 32-qubit computer exists. And Scorpion said, we have talked to numerous insiders and they say no. In defendants' response, all they had to do was say, we have a 32-qubit computer. It's right here. And they didn't do that. And I submit that that is exactly why, on May 5th, the stock price plummeted. There was no other news about IonQ out there, and we aren't asking or suggesting that defendants needed to go line by line through the report and refute each claim. What we're suggesting is that they should have said, we have a 32-qubit computer, and they didn't. And I'm thankful that Mr. Blair brought your attention to sections or pages, Joint Appendix 457 to 491, because if you'll look at them, you will find that none of them involve a 32-qubit computer. The JA 458 to 64, an 8-qubit computer. JA 480 to 85, a 21-qubit computer. And then JA 487 to 91, that is from January 2023. That is after the class period. That still only refers to 21 qubits. They don't have this computer. And the entire point of this company was that we have the computer. And so investors going strictly to loss causation, as Judge Agee, you seem to suggest that that is the fulcrum, and we agree where this court can affirm or reverse. The Scorpion report revealed, and this is pursuant to the test in Singer, that the 32-qubit computer did not exist. And we have multiple sources that confirm that it did not exist. And the idea that Mr. Blair said we did not try to confirm the identities, we've confirmed two identities. So that is false. And when the Scorpion report revealed the previously undisclosed facts that this computer did not exist, and the stock price fell, that at face value fulfills the test in Singer. And we go beyond that in showing that journalists covering this associated the decline in the stock with the disclosures in the report. And one of the cases defendants cite Bajuri, a case from the District of Arizona that says journalist articles aren't important. The important distinguishing factor is that in that case, there were other causes the court was attributing to the decline of the stock, and the stock price fully rallied. Here, the stock price didn't rally, and there's nothing else happening about this company other than the disclosure of the Scorpion report. And that takes us again to defendants' election on their own. They weren't obligated to say anything to the markets about the Scorpion report. But because investors were crediting it, because investors were trading on it, they affirmatively went out and made a mealy-mouthed, non-denial denial about how, without identifying any specific flaw in the report, that it was riddled with misinformation. Let me ask you about CV1. He referred to the fact that there was a computer the size of a SUV. Was he referring to the 32 Qubit? He was referring to the latest version of their computer, which did not have 32. I thought he was talking all the way through about the 32 Qubit. At one point, he says he heard it did not exist, and then he says it did exist, but it was the size of an SUV. That is how defendants have framed our allegations. That's what I'm asking you. And that is not what we allege. What we allege is that the 32 Qubit computer did not exist, and we have cited conversations in time with Chapman, who did not respond. Chapman is the CEO, did not respond. That's not true, but just kind of wandered off, even when CW1 threatened to quit. But he was in sales, right? In sales, but was required to sell the very technology that the company was developing, and who worked with the physicists, who said that it could not be miniaturized and that it didn't exist. The very physicists working on this told her that it did not exist within a week of him joining the company. Okay. Thank you. I think your time is up. Thank you, Your Honor. We'll come down to Greek counsel and then proceed on to the next case.
judges: Paul V. Niemeyer, G. Steven Agee, Stephanie D. Thacker